I don't know if I pronounced that correctly. Mr. Curley for the appellant. Mr. Wilson for the appellant. You may proceed. Thank you. May it please the court and counsel. John Curley on behalf of Plaintiff Appellant William Tonellato. I have the burden convincing you that the trial court's decision was against the manifest weight of the evidence. There are two ways to do that. One when you have an opposite conclusion, clearly apparent, or when the decision is somewhat arbitrary or unreasonable. There's really two problems here with the trial court's decision that I think it's against the manifest weight of the evidence. First and foremost was the fact that the trial judge, in my opinion, really didn't put any thought into this at all. What he did was he said to the parties at the end of the evidence, he says, I want you guys to write opinions for me. I want you to give me one plaintiff and I want you to give me one defendant and I'll sign them. That's a problem. That's somewhat arbitrary to me to say to the parties, you write opinions for me and I'll sign them. What I would much prefer to have happen in these cases is for the judge to think about the evidence, the judge to think about the law and write an opinion based on what he or she thinks. Simply because he requested that the proposed orders be submitted does not establish that the decision was against the manifest weight. That in and of itself does not, but it's clear. And I think if we look at the decision we can pick it apart pretty easily and see why it is against the manifest weight. A perfect example is this. When we were making our case, one of the arguments we made was there was a driveway that we used for a period of well in excess of 20 years. In fact, it was close to 50 years, but well in excess of 20 years. And in his opinion, the one that he signed, he said, well over the last 20 years the shape, location and contour of the eastern edge of the driveway has changed. Over the last 20 years, and that's going to put us, what, 2013 back to 1993. What about the first 30 years? And that's what the court overlooked in this case. The court never in its analysis or in this opinion ever got to the fact that from 1959 until at least 1980 the shape and contour of the drive did not change. And we know what the measurements of that were. We know that the north-south length of the drive during that period of time was at least 34 feet north to south. We also know that the eastern edge of that driveway was 12.5 feet from the eastern edge of Mr. Tonelato's house. So from 1959 until at least 1980 and probably longer, we had a driveway that was used exclusively by the Tonelatos, 35 feet long and 12.5 feet out to the east of his house. Now you indicate that that was not in dispute, that there was no evidence suggesting that that 12.5 feet dimension to the east never changed during that period? In fact, I specifically asked Rose Morasic at trial, can you say whether or not the boundary that's shown in this picture of 1 and 2 changed at any time before 1980? And she could not say there was any change. She could not say that there was any change during that period of time. She could only say that there was a change after that period. And quite frankly, when you look at the pictures, we would agree that after that period of time there was a change. I'm curious about this concept of being able to pick a period of possession that could be many, many years in the past and let's just say 100 years later, say that that constituted the period of adverse possession and to be able to have the possession, to be able to have fee title ownership change 100 years later because you were able to identify a period of adverse possession that far back. Do you have any case law that would support that proposition? I know of no case that says that specific, you know, go back 100 years although. But that's in essence what you're saying is that you have this period that you have identified that dates back to the 50s and 60s where there was this well-defined period of use or well-defined use, well-defined dimensions. And you're saying that is in the record and that should have served as the period of possession for the court's determination. Absolutely. And so what case do you point to that support that proposition? Well, if you look at adverse possession cases oftentimes, an example would be the decision the court did this year in the Brand Force case. You can go back into many cases and see where witnesses come in and testify not only who owns the property now but who owned it 10 or 20 years ago and then who owned it 10 or 20 years ago before that. The McNeil case, I think that was the case out of Champaign County. So you can go back many, many, many years, many, many owners to say this is how the property was used by us, here's how it was used by the next owner and the next. So I don't think there's any limit on how far you can go back. I know of no case that says we're going to cut it off at 25 years or we're going to cut it off at 40 years. You can't go back any further than that. But under those circumstances, aren't you usually looking to prove that the use has stayed the same through all those years? I think most cases that is what's happened. If you look at cases, yes, you would say for the most part the use has not changed a whole lot. But again, the cases don't require that. There's no case that says if the use changes at some point, then adverse possession is out the window. If you look at the adverse possession statute, what good would it do if a change for a period of time took place? Remember the statute says you can't make a challenge after that 20-year period. You can't come in and claim ownership after the 20 years. If you do, it's too late. And so what the Morassic's did here was they waited well beyond that 20-year period to come in and make these changes. So I think the statute would contemplate, I'm sure there's going to be changes. There's going to be changes in ownership. There's going to be changes in use. There's going to be changes in how things look. Trees are going to grow. Trees are going to get cut down. There's always going to be a change. But the key here is not changes in ownership or not a long period of time. It's, look, Morassic's, you've got 20 years. If you're going to stake your claim, you've got 20 years. And if you wait longer than that, which you did, here you waited a good 25, 30 years before you tore up the driveway and put up a fence, that's too late. You missed it. You can't wait that long and then come in and make those changes. So if we can establish a definite boundary for that 20-year period by Mr. Tonelato, we've got it. Now, here, though, and this goes to, I think, questions that both of you had about going back 100 years or different owners or different uses. We really had one person, Tonelato. We didn't have a change. We didn't have to go back 100 years. So the theoretical question is just that. It's just theoretical. Here you have the same person, the same owner, the same user, the same type of use. As far as the next-door neighbor is concerned, the Morassix, Mrs. Morassix's mother and father owned that property from at least 1959 until 2001. That's when the Morassix were given the property by Mrs. Morassix's mother. So you have really just the two families. We don't have a proof problem that you might have if you have to go back 100 years. So that's one of the problems with the judge's decision here. He just looked at the last 20 years. Why should we do that? Why should a person who gets titled by adverse possession be penalized just because the rocks moved in 20 years? Because for over 20 years, they didn't. For over 20 years, they were in the same space. For over 20 years, Mr. Tonelato used it. He maintained it. He drove on it and, in fact, did things even beyond it. So I would suggest to the court that's all we have to prove, and we did prove it. And we did prove it with certainty. Mr. Tonelato's son David testified that that particular driveway, that it existed for that well over 20 years, was 12 1⁄2 feet out to the east of his house. Could I ask you to bookmark where you're at in your argument there and then go back to it? But you say 12 1⁄2 feet. In the order that you had submitted to Judge Sapa, you had indicated 13 1⁄2 feet. And then on appeal here, you indicated it's 14 1⁄2 feet. So how are we to suggest or say that this is a well-defined boundary? Yeah. Here's what – I'll explain what each one of those are. And apparently I didn't make it very clear because I know that that was pointed out in the defense brief. The driveway itself was 12 1⁄2 feet from the eastern edge of the house. So we're claiming we should at least get 12 1⁄2 feet. Now, we're claiming more than just the driveway. I understand this court could say, look, the driveway was 12 1⁄2 feet is all you're going to get. I understand that. In fact, the trial judge could have done that and didn't. But if you look at those photographs and you look at Exhibit 1, if you – I don't know if you have all those in front of you. The very first one shows a maple tree in front of the property. You can see that gravel driveway goes at least to that maple tree, which is actually 13 1⁄2 feet east of the house. And we know that from measurements that were given to trial. What's the measurement from – I'm looking at Exhibit 14. I don't know if this is a plaintiff's or a defendant's. I can't remember. But in any event, it's a picture that shows – or a photo that shows the orange surveyor's – or not a surveyor's painted stripe. This is one of the defendants that had painted that. Yeah, Mr. Perez did that. Okay. From the foundation to the painted line, what's the length? He put that where he thought the line was, which was roughly 7 feet 9 inches. Okay. That's about 7 feet 9 inches from the eastern edge of the house. And that's where Mr. Perez thought the property line was. It turned out he was wrong because we had two different surveys and they both – one went one way and one went the other, so they weren't even consistent themselves. But it's interesting to note on that, getting back to the measurement issue, the 14 1⁄2 feet is where we're saying the wire fence was at that was up for about 15 years. And we're saying we maintained all the way to that wire fence for the entire 50 years. Mowed it, planted grass on it, cleared weeds, brought in field herbs. So that's how we came up with 14 1⁄2 feet. We really believe we're entitled to that. But we also understand if the court says, well, you only get to where the rock was on the driveway, that's 12 1⁄2 feet. But if you get us to where we believe we maintained for all those years, that's where the wire fence was at that you see in Exhibit 1, and that's 14 1⁄2 feet. Was there evidence that the defendants also maintained that strip to the west of the wire fence? They said they did two things. They said they would occasionally go in and mow it, and then sometimes pick up rocks that came out of our driveway. How often they did that or how many rocks, I don't know. She just said they would pick up rocks. The interesting thing, going back to your measurement on the orange line, what the court didn't seem to catch here, and I don't think anybody did really early on, was that by defendants' own admission, they've encroached on the driveway that they admit Conrado had used really 50 years, the whole time, not just the first 20 years. Because he said, well, I put this orange line roughly 7 feet 9 inches or so from the house, but we admit that at that time, in 2010, the driveway was 9 feet 4 inches east of the house by that time. So even he's admitting, well, I'm putting the orange line on a place that is obviously over the driveway, and he said that he tilled 8 feet 6 inches from the eastern edge of Mr. Tonelato's house. So defendants admit the driveway, this is again 2010, 9 feet 4 inches to the east of the Tonelato house. But yet, even though I admit that, I'm also admitting that I got my garden tiller, and I tilled 8 feet 6 inches from that house. But by his own admission, he's saying, I tore up his driveway. And the trial court completely failed to see that. It's impossible for there not to have been adverse possession, through the whole 50 years, for a minimum of 9 feet 4 inches, although I'm saying it's more. Because they admit, well, we tilled it up, we tilled up his driveway. And then on top of that, we put up this fence, and we bring in all this filter, and now look what we've got when it rains or snows. So now we're flooded. Not only are we going to dig up his driveway, and not only are we going to put up a fence well, well to the west, of where he's been using this as a driveway for nearly 50 years, but we're going to make this property flood now. So even if, you know, we've contended that now you can't go far as to open the doors and get out. The flooding would be a separate cause of action, wouldn't it? It is, and we've put that in account too. We've said in account too, look, we've got a prescriptive easement here. If not adverse possession, we've got a prescriptive easement for the use of this driveway. And what they have done is they have not only put a fence up, but they've also created a flooding situation. It keeps us from using the prescriptive easement. And so what the Brandhorst case said, this court said, was, essentially, move the fence and take the dirt out. Put it back to the way it was. Now, in that case, it was a curb and gutter, so it was even harder to undo in that case than it would be to do in this case. Weren't there photos introduced at trial that showed there was water on the drive prior to that? Yes, and you can see the difference. If you compare a photo... If you compare photographs 15 and 39, take 15 and 39, and you'll see what Mr. Tonelato's driveway looked like before the fence and the dirt was drawn in. You'll see what it looked like when there was rain. Then you compare those, 15 and 39, and I'm going to give you several here because I think they're all worth looking at. Compare those to 12, 13, 43, 61 through 65. Blow your mind. The difference between the way the water would stand before compared to now, you know, very little water would stand during rain. Well, did your client channel the water from his home? What he did was, there was a grass burn between the two tire lanes, and he did cut through that grass burn a little bit of a... what we call a ditch, just a little spot out, so it would go over into the eastern lane and hopefully drain out. Now, the defendant's claim, though, that caused our land to flood. Well, before he did that, the water apparently flowed down his driveway. That was the natural flow. Yes. But then he channelized it so that it went east. In the Swigert case that you cite too, it refers to the natural flow of the surface water. You're not talking about a natural flow here. You're talking about something that has been created, this flow, by your client from his home to the east. Well, yeah, here's the remedy for that. I would say this. The old adage, two wrongs don't make a right, applies here. If he did something that altered the natural flow of the water and it created a burden on the defendant's land, is it their right to make things worse than they were even before the little channel was made? In other words, if they want to make a change, the change to be made is, hey, let's restore things back to the natural flow. Now we've made a lake. Instead of doing that, we're going to make a lake out of your driveway. And I don't think the law should say that's okay. The law should say, hey, you've got a problem with what Mr. Tonelato did, tell him to change it or go to court and make him change it. Don't make a lake out of his driveway. Thank you. Mr. Wilson. Thank you. May it please the court, counsel. My name is Brad Wilson and I represent the defendants, Dallas and Rose, Rose and Morasset. Now in this case, Mr. Tonelato, the plaintiff, has claimed that he's acquired, via the title of adverse possession, the westernmost portion of the Morasset plot. Now he's not claiming that he's just entitled to the area where the driveway sits. We referenced Exhibit 14. This is Exhibit 14. He's not claiming he's entitled just to the portion where his driveway sits. He says he's entitled all the way back from Converse, all the way back to the northern or backyard boundary. Now in order to establish that claim of adverse possession, the court's well aware Mr. Tonelato had to prove five elements. Each of these elements had to have existed continuously for 20 years. First, he had to prove that his possession was continuous. Second, it was hostile or adverse. Third, it was actual. Fourth, it was open, notorious, and exclusive. And five, it was under a claim of title inconsistent with that of my client's. The elements are pretty well established in the briefs here. Can you comment on this issue of which 20-year period the court can look at? Or you've heard the suggestion made that you can look back to the period of time in the 50s and 60s, and the conduct of the parties or the property owners at that time. Sure, I'll be happy to comment on that. But first I want to address, there's an argument being made that it's undisputed that the shape and location and change of the driveway didn't change during that 20-year period or 21 period from 1959 to 1980. That's not true. Mr. Tonelato, that's undisputed, moved into the house and rented it from my client's father, Glenn Fettinger. Mr. Tonelato moved into the property in 1959. He bought the property or took over the loan payments in 1962. According to Mr. Tonelato's own testimony, when he bought the house in 1962, the house itself was 24 feet long. He testified that the driveway in 1962 extended 10 feet past the end of that 24-foot residence. It's undisputed that in 1964, Mr. Tonelato built a 16-foot addition onto the back of his house. After that addition was completed, that would have meant the driveway was 10 feet short of the end of the house. After the 16-foot addition was built, Mr. Tonelato then built a garage approximately 20 feet beyond the rear of the house. The garage is in the northwest section of the house. In 1964, after the garage was built, Mr. Tonelato extended the driveway so that it was no longer stopped 10 feet short of the house, but extended it another 20 feet to the garage. If you add up Mr. Tonelato's testimony, he testified that in 1962 the driveway was 36 feet. Well, that's extending the north-south dimension. How does that change the eastern boundary? Well, if you're going to use the driveway as a starting point for the eastern-western boundary, and say that this driveway was here since 1959, hadn't changed from 1959 through 1980, well, obviously the northernmost 26 feet, I believe, or 30, you've got 26 feet, wasn't even present. How was Mr. Tonelato driving on a driveway that wasn't even portions of the driveway for 20 years, when a portion of that driveway didn't even exist for the first six years? Again, if you're taking the eastern edge of the driveway as a starting point, say we get to go out another four feet, what do you do about that portion of the driveway that didn't exist until 1964? You can't use the edge of the driveway as your starting point when a portion of it did not exist. And I believe that the evidence did show that the eastern boundary had changed during that 20, and the eastern boundary would be the boundary closest to my client's house. It did change over that period from 1959 to 1960. During the trial, Mr. Tonelato testified about how he added a layer of gravel to the driveway in 1976. At trial, Mr. Tonelato said that when he added that layer of gravel, the driveway was already encroaching over off his 40-foot wide lot onto the Morasset lot. That testimony was shown to be inconsistent and was impeached because in his deposition, which had taken place two years earlier, Mr. Tonelato admitted that when he added the layer of gravel in 1976, the driveway was located entirely within the 40-foot wide lot he purchased from Lynn Clevenger in 1962. The trial court could have looked at that impeachment and determined that Mr. Tonelato was not a credible witness and could have found that in 1976, the driveway was not encroaching on the Morasset lot, it was entirely contained within the 40-foot wide lot that Mr. Tonelato had true title to. And there was other evidence in the record which could have caused the court to question Mr. Tonelato's credibility when he testified that the driveway's shape and location hadn't changed. For example, there was evidence about the manner in which he used the driveway. In the trial, Mr. Tonelato testified that he would pull his car into the driveway, and sometimes pull it into the garage, and sometimes park it in the driveway. Again, Mr. Tonelato was impeached at trial because in his deposition he testified that his customary practice was to park his car in the garage. That's significant because they're not only claiming where the driveway sits now, they say they're entitled up to 14 feet because Mr. Tonelato's family supposedly would open the car door, get out of the car, and walk along the western edge of the Tonelato's property, probably Morasset's property. That claim is inconsistent with his discovery deposition testimony where he said  Well, even if it was accurate, you would say that's not exclusive possession because your clients had used the same portion of the land. Absolutely. It's undisputed that all the way up to the edge of the driveway, and I think the testimony at trial showed that the Morassets mowed the yard not on an occasional basis, but on a consistent basis. At least there was sufficient testimony to support the trial court's conclusion that Dallas and Rosemore, or specifically Dallas and Morasset, consistently mowed the grass and maintained the property all the way up to the edge of the driveway, all the way up to the edge of the garage, and all the way up to the wood stake fence which encompasses Mr. Tonelato's backyard and runs all the way from his garage to the northern part of the property. So again, there's questions of fact that I think that that's the exclusive domain of the trial court to resolve. They're in the best position to judge the credibility of the witnesses. It's not cut and dry like Mr. Tonelato argues. There was disputed issues of fact. The trial court found one way. I think that that determination should not be subject to overturning. It's not against the manifest of the weight of the evidence. Also, there were other problems besides Mr. Tonelato's inability to prove possession up to a definite and distinct boundary. The biggest issue with his claim of adverse possession, in my mind, is he failed to show open and notorious and exclusive possession. Now the test for open and notorious possession is whether the neighbors or the community would have been apprised that Mr. Tonelato had exclusive use and control of the enjoyment of the property. The evidence that Mr. Tonelato offered in trial to support his claim that he had open and notorious possession was testified well in 1959. I removed some junk trees from a portion of the property. In 1960, I did some bat filling in a smaller portion of the Tonelato property, and I also buried my dog under a bush on the property. That all took place within a relatively brief period of time, within one year, that doesn't begin to show continuous use for the 20-year period. Now the other evidence Mr. Tonelato offered in support of his claim that he had open and notorious possession was he said, well, I shoveled some snow off my driveway. I mowed part of the morass a lot, various parts. He admitted that the parts he mowed changed over the years. And I occasionally planted some grass seed whenever the kids, in his words, chunked it out. Well, shoveling dirt or snow off the driveway doesn't help Mr. Tonelato with any portion of the morass a lot other than the narrow portion where his driveway sits. It doesn't help him with his back area back here. It doesn't help him with the area adjacent to his driveway. Mowing or putting grass seed doesn't really show open and notorious possession. At least he didn't prove it by the clear and convincing standard that he had to meet because he didn't testify how frequently he put down grass seed. He didn't testify where he put down grass seed. I believe his testimony is that off and on for 20 years when the kids chunked it out. It doesn't establish a definite boundary. It doesn't show, I don't think that would show to the community that he's claiming exclusive possession. The fact that he mowed the grass, that's undercut by the fact that the undisputed evidence shows that since 1969 Dallas and Morassie mowed those exact same portions. And even before 1969, Rose Morassie testified that the tenants who rented the house that my clients now owned, they mowed all the way to the edge of the Tonelato lot. Exclusivity means that the rightful owner must have been deprived, altogether deprived of possession. It's undisputed that that didn't happen. It's undisputed that Mr. Tonelato never tried to keep my clients off the property. It's undisputed that my clients used and maintained the property all the way to the edge of his driveway, all the way to the edge of his garage, all the way to the edge of the wood fence. It's undisputed that not only did my clients and their daughter use the property, their guests did too. And more importantly, Mr. Tonelato admitted he never attempted to deprive the Morassies of ownership of the property. When asked about this at trial, he admitted, well he didn't do it because in his words, well we didn't own it. That statement also goes to another shortcoming in Mr. Tonelato's case. He has to prove that he did all this under a claim of ownership inconsistent with that of my clients. Now, I think the evidence showed that the majority of the time, the Morassies and the Tonelatos lived together, they were typical neighbors. Their kids ran across to each other's houses. Their kids played in each other's yards. This is a typical neighborly situation for the majority of this period. At no time, though, did Mr. Tonelato, and Rosa Morassie said, I knew his driveway had started to approach over onto our lot, but you know, it was okay. But now, Mr. Tonelato, 50 years later, says, well you know when I was walking on your property, you know where my kids were playing on it? I now own that. Well no he doesn't, because he never undertook those actions under a claim of title. He admitted, he didn't consider himself to be the owner. He admitted at trial, his words, we didn't own it. So he never did any of these acts under a claim of title. What about what your clients do acknowledge? And I'm looking at the fence application, the fence permit application. There's an addendum to it, and they've set forth in that, that according to the survey, the property line is 8 feet 2 inches east of the foundation of the Tonelato house. Then they go on to say that they believe that Mr. Tonelato might be entitled to an additional 10 inches via adverse possession, and then they go on to say that they will set the fence back at 9 feet 4 inches. And I'm just wondering, was the 10 inch suggestion in this accurate? Did they mean 10 inches, or did they mean 14 inches? Because 8 feet 2 inches and 9 feet 4 inches isn't 10 inches. Do you know, did that come up at trial? Mr. Tonelato, the fence application wasn't dealt with extensively at trial. It was, I think, pointed to as evidence as to when the wire fence referred to by Mr. Curley, when that, how long that had been up, because there was a dispute as to when the wire fence might. My clients, at some point in time, erected more of a chicken wire fence to enclose their truck garden. Well, and that, yeah, this isn't the fence enclosing the garden. This is the fence application of the new fence that is shown in the photographs. So, I'm not, maybe I missed your, are you asking where the location of the current fence is relative? Just the disparity between the 10 inch figure that's shown in this addendum to the application, 10 inches, indicating 10 inches, and then 8 feet 2 inches versus 9 feet 4 inches. That would be 14 inches. Is it 10 inches that they're acknowledging that Mr. Tonelato is entitled to, or is it 14 inches? I don't believe that where they constructed the fence they're acknowledging that he's entitled to ownership. I think they were being good neighbors. The process was that they're building the fence, and they said, here's the property line. We're going to continue, we're going to set our fence, we're not going to pick a fight and try to argue, no, you can no longer drive in the driveway. And I think they could have. I think they could have established that Mr. Tonelato did not actually have adverse possession. That's a legal conclusion that my clients as laypeople are not qualified to make. And they say he may have ownership via adverse possession. But what they did do is act as good neighbors. They found out where the property line was. They saw that the real property line, which is, this orange line is pretty close. One of the surveys said the actual property line was closer to Mr. Tonelato's house by a few inches. Mr. Tonelato's survey shows that it's actually, Mr. Tonelato's survey shows it's actually in the other direction a few inches. So the orange line is actually a pretty good approximation if you split the two survey results. My clients acknowledged, his driveway is there, he's been using it, we're not going to be bad neighbors and dig up his driveway. And no, they didn't dig up his driveway. They photographed evidence. They ran the tiller along the edge. Even in exhibit 14, you can see the rocks underneath the dirt. Yes, the tiller finds through dirt on the driveway, but they didn't dig it up. And then my clients decided, we're not going to interfere with Mr. Tonelato's use of that property. We're going to let him do it. And they set their fence back. They could have been bad neighbors and may have picked a fight over this, but they tried to work with Mr. Tonelato. So, and that goes to his easement. Mr. Tonelato says he has an easement because he and his neighbors, or he and his family members would open their car doors, get out and walk. On the Morassic property. You can testify. How far out did they walk? Where is the judge supposed to decide the size of the easement? The size of the easement is supposed to be established by the prior use. There was no definitive, clear and convincing testimony as to the extent of their prior use. They say we got out and we walked. Where? Where did we walk? Did they walk? Did they get out of their car and walk four feet onto the Morassic line? Did they get out of their car and walk one foot? We don't know, Your Honor. That's not our problem. That wasn't our burden of proof in trial. That was Mr. Tonelato's burden of proof, and it was a pretty high burden he had to meet. Clear and convincing, unequivocal evidence. He didn't do it. That's why the trial judge ruled against him. With respect to the water issue, I think that you've hit, Your Honor, the nail on the head. This is not a case like the Swyder case where there's a natural flow of water that's been disturbed. This is where Mr. Tonelato created an unnatural flow of water by digging the culvert from his downspouts to all the water off his roof in the gutter system, then cutting it. The testimony of Rosen Morassic was unimpeached. It's unchallenged. It shows that that culvert was dug. Prior to that, their strawberry patch never flooded. Once that culvert was dug, their strawberry patch flooded. The photographs that were shown by counsel, he never offered any evidence as to how much precipitation occurred on each of those days. We don't know if Mr. Tonelato took a picture in particularly heavy rain and used that as evidence of flooding or not, but we do know that after he cut that culvert, the unimpeached evidence shows that my client's property started to flood. Mr. Tonelato now claims, well, if I did something wrong, that doesn't entitle them to do anything about it other than to go to the courts or to ask me to correct it. Well, you know, maybe two wrongs don't make a right, but also there's the doctrine of unclean hands. I don't believe that creating a nuisance and then complaining because your neighbors abated the nuisance is a valid legal theory. Well, that swagger language is a little problematic. I mean, just if you mine down to its essence, when you talk about a natural flow of water, you're saying that it flowed down the driveway. That's not a particularly natural flow of water because the driveway isn't something created in nature. That certainly was artificial. So at what point do you look back to find natural flow? Back when it was populated by the Indians? So can your client or can Mr. Tonelato put another six inches of driveway fill in there and raise it? And now we're just competing with elevations? If you're asking, and I realize my time is up, but ask me to respond, I would go with what the historical flow had been. The historical flow had been, at least since the driveway was built, for the water to run down the driveway. The unimpeached testimony of Rose Morassic established that. The unimpeached testimony of Rose Morassic showed that this artificial creation was definitely digging a culvert to direct water off your property, under your neighbor's property, when it hadn't flowed there before. That's definitely not a natural flow of water. Thank you. Thank you. Mr. Curley, the vote. As lawyers, we always try to give our clients the best advice that we can. And be honest with them and tell them they can do things consistent with what the law allows them to do. So I think what I've just heard is, then, is if this decision is upheld and the fence can stay and the truckloads of dirt that was brought in, if all that can stay, then I have got to do my duty as a lawyer and tell Mr. Tonelato to build a concrete wall so that all of that water will go right back on to the Morassic property and flood their strawberry patch. I don't have any choice but to do it. That's the only advice I can give him. Well, did you even ask in the complaint to have the dirt berm removed? I did. In count two? In count two. The claim for relief just indicates that you're requesting the removal of the fence. It doesn't say anything about the dirt berm being removed. You allege in paragraph 12 that there was placement of dirt that caused change in water drainage, but in the prayer for relief, there's nothing suggesting a request for the dirt berm to be removed. Well, I think if you remove the fence, though, because of the adverse possession and allow them to go back to use the driveway the way they used to, it's by necessity it's going to have to be removed. Otherwise, you couldn't go back to using the driveway the way he did for all those years. So it has to be. If we're going to restore the parties to the position they ought to be in, the dirt has to go. So that's the only way to do it. Thank you. As far as going back to a statement that was made, I think, by counsel, is that this whole idea of not being able to establish a boundary is simply not the case. I asked Ms. Morassic at trial to look at Exhibits 1 and 2. Pictures taken in 1980 show where this rock is. And I said, would you agree with me that you cannot dispute that where the rock is shown in Exhibits 1 and 2 was there at least since 1960? She said, yes, I agree with that. So even the defendant admits that where you see that rock in the picture, 1 and 2, had been there since at least 1960. And that would have been a distance of 35 feet north to south, 12 and a half feet to the east of the house. At a minimum, the proof is that Mr. Tonelato is entitled to adverse possession, or at a minimum, an easement for that property, for at least that much. Now, again, we've asked for more because he did other things other than just drive on that driveway. Yes, they got out of their cars, they walked on the property, on the grass, mowed the grass, buried a dog there, did certain things to it. But at a bare minimum, he's entitled to 12 and a half feet from the eastern edge of his house. Thank you. Thank you. We'll take this matter under advisement. And stand in recess until the writing is in the next case.